Thank you, Your Honor. Anthony Dane, appearing for Mr. Ayala. Also my associate, Robin Phillips, is appearing. We're both going to be arguing, and we're focusing only on the first three issues, the exclusion of counsel and decline of the Batson proceedings, the equal protection rights of the excluded jurors, and the lost questionnaires because of time constraints. I'll be arguing the first two for 10 minutes, then Mr. Phillips would argue the third one for 10 minutes, and we'd reserve 10 minutes. You better keep track of your time so you don't eliminate Mr. Phillips. Okay, I'll try my best, Your Honor. Thank you. Your Honor, I want to start out with the first issue with respect to the exclusion of both the petitioner, Mr. Ayala, and his counsel from the Batson proceedings. The very fundamental U.S. Supreme Court law that avoids the Teague Bar is the same law that the California Supreme Court unreasonably applied. And I want to start with the mistake I think that the district court made was in defending its rule from Batson and saying there is no clearly established law that a defense counsel and a defendant are required to be present at Batson hearings. But the rule is more fundamental and dates back to United States v. Cronic. So what is the constitutional rule that you think had been established in May of 2001 when Ayala's conviction became final? That a defendant and his counsel have the constitutional right to be present during a critical stage of the proceeding. And as the Supreme Court said in Gomez v. United States, voir dire is a critical stage of the criminal proceeding. And here's where the dependence from Batson is incorrect. Because in Gomez, the court said jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice. But by saying the jury free from racial prejudice, Batson is the proceedings within jury selection that assures that. It is not the right in and of itself. So a defendant, I'm sorry. What should a court do if the opposing counsel, because some of these rules do have an exception in the Batson context for compelling reasons for not including counsel. So what should a court do where, as here, the, I guess the prosecutor said, well, if I give you my reasons, you'll know my trial strategy. So he takes them back. But then when you start looking at all the reasons that were actually given, they're not trial strategy. What is the court supposed to do? I mean, is there a law on that? There would be, and there would be separate law for that. It's no different than what we, most of who have been prosecutors and defense counsels, know is a Pitchess motion or something similar. A judge for the very specific issue of determining whether it would be, in fact, strategy may be allowed to hear from the prosecutor. That technically would not be within the critical stage of jury selection. It's a prosecutor saying, I have some strategy I don't want to reveal. Frankly, what the court should have said, then don't reveal it. Nobody needs to know your strategy. There's nothing about picking a jury, as Justice George so eloquently noted in his dissent. There's nothing about whether you use a one through ten method or I use a plus zero and minus method that's trial strategy. It may be your own trade secret in how you pick a jury, but that's not protected. So the judge should have inquired strictly, what strategy are you claiming would be revealed? Once the judge was satisfied there was no strategy, then you cannot exclude the defendant and his lawyer from the critical stage. And let me give an example. Suppose the prosecutor had said, well, when I question witnesses, that involves my trial strategy. So I don't want the defendant to hear that. We would all say that's wrong. It's a critical stage. You can't exclude the defendant. And we would find it to be structural error. Well, I guess that was my question. Do you contend that the established constitutional rule defined as structural error? Must a YALA show prejudice in order to qualify for relief? No, it's structural error. And that's what Cronick says. Cronick lists a series of cases and it says, this is Cronick in footnote 25. The court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent or prevented from assisting the accused during a critical stage of the proceeding. Structural error. So Breck doesn't apply. Well, once the California Supreme Court found that it was error to have excluded counsel from defense counsel from the ex parte proceeding. Doesn't that shouldn't the government have the burden of proving that that was harmless beyond a reasonable doubt? Isn't that the thing that we look at? First, if it's structural error and I can go into the basis for that. Let's assume it's not. Let's assume it's not structural. Absolutely. And that's what, again, I go back to Justice George. He had it right. What he said is even if once you find error, it's incumbent then upon the prosecutor, who, by the way, caused the error, to prove harmless beyond a reasonable doubt. And Mr. Phillips will better address it. But how could you ever prove harmlessness beyond a reasonable doubt when the State both caused the exclusion of defense counsel's input and lost jury questionnaires so you couldn't fully evaluate the full facts? And Batson does require all the relevant facts to be evaluated. So, yes. I'm sorry. So, but in that harmless beyond a reasonable doubt analysis, do you just consider the comparative weighing of who was, do you consider that within only the Batson framework or do you look at, oh, there was overwhelming evidence of guilt. So it didn't matter if the jury was entirely biased against him because he would be convicted anyway. No. And this is why, and let me do it. I'm sorry if I keep repeating structural error, but let me show you why under a Chapman standard it would be illusory. Because structural error by its very nature, as the U.S. Supreme Court said, and I believe this is the Gomez case, structural error is where the prejudice is, it defies prejudicial analysis. You'll never know because you can't be in the jury room. Well, if there's structural error, then let's say you win. But I think for purposes of our time, let's assume that maybe that argument's not going to work. So why don't you go, why don't you spend your time at the next level to address those concerns of the court? What I'm saying is the problem the prosecution has is it has to say beyond a reasonable doubt the error and exclusion, and then later, of course, the loss of the questionnaires, affected or did not affect the jury. As one Supreme Court said. Did it not affect the jury or the composition of the jury? Well, it certainly affected the composition of the jury, which is the U.S. Supreme Court has said that is what is the error. The question is whether it violated Ayala's equal protection rights. Well, it violated his due process rights. It certainly violated the juror's equal protection rights, which is equivalent. Well, the ultimate jury, if it wasn't composed of his peers because there were improper exclusions of jury, preliminary charges of jurors, then doesn't that affect his rights? Oh, absolutely. His Sixth Amendment right to a fair trial, his due process rights, and it also affects those jurors who didn't sit, the minority jurors, their equal protection rights. And I'm going to cite now from Vasquez v. Hillary, which is a U.S. Supreme Court case, 474 U.S. 254 at 263. What year? That is 1986. When a petite jury, I hope I'm pronouncing that correctly, has been selected upon improper criteria, it also says or has been exposed to prejudicial publicity. We have required reversal of the conviction because the effect of the violation cannot be ascertained. And we have here a jury that was selected upon improper criteria. So even under a harmless error test, Your Honor, the prosecution or the State cannot meet its burden. But I want to take you a step further even because I want to cover just, you know, not where you would ‑‑ I know you're going to probably say nothing, but just I want to ‑‑ Yes. What deference, if any, do you contend this panel should give to the California Supreme Court's opinion? The deference it should give to the California ‑‑ certainly it should give deference to the fact they found error in the exclusion. But just as Justice George didn't give any deference to the opinion it was harmless error, you can't give deference because, as Justice George said, it's illusory to say that the remaining portion of the record is constitutionally sufficient. But they did find that the record was adequate. So let's assume that we have to look at that. And if you're going to say that they're not entitled to deference, you have to give me some reason why. And here's how I'm going to do it, Your Honor. That's exactly what Mr. Phillips is going to address. All right. Even if he didn't want to. No, no, no. Please, yeah. Okay. Are you going to talk about harmless error? Is that your general subject? Or what is your subject? No, my general subject is the loss of the questionnaires and specifically the problem that that causes in creating an irremediably incomplete record. Can you speak up a little bit? Sure, Your Honor. So the problem that was raised a moment ago is should we give any deference to the California Supreme Court? And you're one of the Robins. You're Robin. That's correct. Robin. Robin Phillips. Dane? No, Robin Phillips. That's correct, Your Honor. Okay. And the problem here is it was unreasonable for the California Supreme Court simply to say that the record was sufficient. The rule at play here is from the U.S. Supreme Court, which is that the due process requires that the record be sufficiently complete in order to permit an adequate and effective appellate review. And that comes from Griffin v. Illinois and from Henry Winship. Which are what years? I'm still trying to figure out what, if anything, is team barred. And these are older cases, and I can certainly assure you they come from before 2000. And I don't have the dates with me in front of me right now. But the point here is that the California Supreme Court clearly unreasonably applied that rule. Okay. So what we have is we have the retained. We've got some alternate questionnaires. We have the 12 that were seated questionnaires, right? That's correct. And then what we don't have are the questionnaires of those that were challenged under Batson that were peremptory challenges. And those are the critical questionnaires. But we have voir dire of that, correct? That's correct. But as Mr. Dane was saying, you can't rely on the voir dire here because the transcript itself is illusory, having been pretty much one-sided because the defense at that stage didn't know what the prosecutor's reasons were. They didn't have an opportunity to respond to the reasons. But when you have to make your prima facie showing, albeit a fairly low bar, and I've had experience having people make those in front of me or having had to deal with those, that you obviously say whatever the defense counsel is going to say, whatever he or she thinks at that point, why there's a prima facie case, right? That's correct. Which might address some issues, and this Batson challenge was sort of a progressive thing. For example, the first challenge, there wasn't a prima facie case, and then eventually there was. So I guess in the record that we have, is there anything other than the racial identity of the seven jurors challenged by the prosecution that arguably undermines or questions the prosecutor's stated reasons that for challenging the jurors? Yes, sure. I can give you a multitude. Firstly, the prosecutor struck three jurors because of their supposed beliefs regarding the death penalty. For example, panelist Martinez was struck because the prosecutor was concerned that he wouldn't be able to impose the death penalty. And there we even have on the record the trial judge disagreeing with the prosecutor and saying, well, the questionnaire for Martinez actually says he's in favor of the death penalty. So there's a direct contradiction for you. And there are others. For example, the police officer panelist who was a minority, who was struck because the prosecutor had an issue with the fact that he'd applied to be a police officer and was rejected, and meanwhile there was another seated juror who landed up sitting on the jury who had also applied to law enforcement and been rejected. And so there there appears to have also been a pretextual reason. But over and above that, the statistics themselves give an inference of discrimination. What about the juror that was a holdout juror in a prior case? Is that can ‑‑ is there anything you can do with that? Your Honor, it's very difficult for us on such an issue. Because, I mean, what prosecutor in their right mind would leave a juror on that had been a holdout in a prior case? I mean, that's pretty much end of story, right? Your Honor, and I do hear you there. But our purpose here is to show that if there were just a host of pretextual reasons, then that will undermine the credibility of the prosecutor. Well, you only need one juror. So what's your strongest juror? What's your strongest juror? I would say at this ‑‑ at this stage, our strongest juror is the juror who was ‑‑ who had applied to be a policeman. And ‑‑ And the name of that juror? The name of that juror is ‑‑ one second, Your Honor. I believe that was Panelist Stamos. And the seated juror who was also rejected by law enforcement was Charles C. So what's the juror's name that you're saying is the strongest case? I believe it's Panelist Stamos. Stamos. Okay. And where was he in the series of challenges? I couldn't tell you offhand, Your Honor. But ‑‑ I can give you a four-juror if you have a stronger case than that lady. By all means, Your Honor. And you may be right there. It's very difficult for us to be in a position where we have to say that there was bouts in error. That's not what we're trying to do. What we're trying to say is the record is insufficiently complete for anyone to assess whether, in fact, there was bouts in error. Okay. But the California Supreme Court said it was adequate. So if we assume, just for purposes of argument, if we get to a point where we have to give some deference, what deference are they entitled to and what can you show me was objectively unreasonable? What was objectively unreasonable is the finding that the record was sufficiently complete. Well, that's circular. You know, that's ‑‑ so kind of give me some ‑‑ give me something more specific. If we give deference to their finding, give me something specific that said that wasn't objectively reasonable. Well, you've got these questionnaires. The questionnaires are 17 pages long. They have 77 questions. Many of those questions pertain to the panelists' beliefs about the death penalty. All that information is gone. There's more information just in those questionnaires than there is in the entire void transcript regarding those panelists and there's seven of them and that information is all gone. How do you say under Batson that you are able to investigate the totality of the relevant circumstances when the majority of the information pertaining to the Batson challenges is lacking in the record, completely gone? You can't do that. It's unreasonable. It is unreasonable to say that for the California Supreme Court to say they had sufficient information before them and a sufficient record to rule on these Batson issues. Now, I know the court didn't keep the questionnaires and the prosecutor didn't. Did they ever ‑‑ you turned a couple of questionnaires over. Did they ever ask you if you had those questionnaires? I believe at some point they may have asked, but we didn't have them. They were given to the court. The court kept them, I believe, under seal for some time and then ‑‑ I can actually answer that because I was counsel from the beginning. We collaborated with the respondent at the time and with the court and everybody attempted. We went through every box we had. The questionnaires that are available are the ones that everybody looked for and that's it. Thank you. You're welcome. So unfortunately, Your Honors, at the end of the day, the bottom line is that the questionnaires have been lost and it's absolutely unreasonable for any court to find that there was a sufficiently complete record to do a Batson analysis here under Step 3 of Batson. You cannot say anything about the totality of the relevant facts. Okay. So at the time that counsel that was, I think, trial counsel, was making the objection that was saying that was objecting to the use of the peremptories and was making an effort to show the prima facie case. At that time, the prosecutor, the judge, and counsel for the defendant would have had all the questionnaires, correct? That's correct, Your Honor. And my understanding of how this is done, and I think particularly back when the voir dire was done at this particular time, the judge would have read all the questionnaires and oftentimes participated in the voir dire as well, right? Absolutely. So everyone had all of that information at the time that the initial challenge was made. And then when the judge asked for, allowed the prosecutor to make those showings in camera, as it were, the judge made certain findings about whether he believed, was it he, the judge, that he believed certain things or didn't or went through. At that time, the judge had the questionnaires, right? That's correct, Your Honor. And so what was eliminated there, and then there's apparently a case that says, okay, even if you have a right to be present, you don't have a right to say anything. Well, that would be the Lewis case, Your Honor, I think you're referring to. Right. And there, what the Court is saying is that it, and they're saying this only in dicta, that it's not clearly established that counsel has a right to argue. But in Lewis, counsel was present.  Counsel could have perhaps later brought a motion. He could have done follow-up for Adair to test the reasons. He also could have established whether other jurors held the same beliefs in showing that they weren't stricken from the jury. There are a host of things that could have been done had counsel at least been present. I have a question, too, in terms of as these motions were progressive. It didn't seem that counsel for defendant revisited the original reasons, go back and went back to the original jurors, and it just seemed like every time it was just talking about the ones that were being challenged. But it didn't go back to how it originally started. And when you're making a prima facie case, it's obviously, it's a progressive type of thing, right? That's correct, Your Honor, yes. And I do believe that at several stages defense counsel did object and at some point say, you know, what the prosecution has done is bleach clean the box of any minority. Counsel, you wanted to save 10 minutes. You're down to 18. Yes, I do. And so on that note, I'll brief you. Thank you. I'll brief the end. Good morning, and may it please the Court. Robin Derman, the other Robin. Good morning. California Deputy Attorney General on behalf of Appellee. Appellant's burden in establishing entitlement to habeas relief is incredibly high. He hasn't shown that there is clearly established United States Supreme Court authority that controls the issues that he raises, and he hasn't shown that the California Supreme Court's decision denying relief was so incorrect that it's not something about which the decision that there was error was incorrect. He's only quarreling with the harmless heiress.      So I think it's worth it. So I'm just going to give you this portion. Okay. So all we have to do is we don't have to worry, then, about whatever it is, the ‑‑ But what ‑‑ the difference is over harmless error. I think that the difference is over the State court's denial of relief, however the State court reached that relief. But on the ground on which they denied relief was harmless error. I would think that the disagreement is actually over the denial of relief in general, no matter how the State court reached it, because you still ‑‑ this Court still has to start from the premise of what is the controlling United States Supreme Court authority. Well, I guess sort of teeing off of Judge Reinhart's Teague question, if ‑‑ I guess starting from do you contend that a defendant does not have a constitutional right to have his attorney present when a prosecutor responds to Batson or Wheeler challenge, or only that such constitutional right was not established in May of 2001? I contend that he does not have a constitutional right under Batson v. Kentucky to presence or counsel at step two of a Batson hearing. Okay. Now, if this Court ‑‑ how does the analysis differ whether the Court at the initial stage decides there's a Teague bar on the Batson issue? But that still wouldn't end the inquiry, is that correct? Yes, Your Honor, and I see the Court's point. The inquiry in this case under the Teague question and the merits question is kind of one and the same. It's do we have ‑‑ if we accept Appellant's rule that he has a constitutional right to presence and counsel at this stage, the violation of which is structural error, then is that a new rule of criminal procedure that could be applied retroactively to throw out a State conviction? And is it a rule that is clearly established under the United States Supreme Court precedence for AEDPA purposes? So it seems that the merits analysis and the Teague analysis are inextricably intertwined. So even if you find Teague barred by the district court, then when you go to the next analysis and you're analyzing the sufficiency of the record, how does the Teague bar, if you've found that, how does that affect the analysis under the sufficiency of the record and any deference the Court is entitled to? Does it say that that right can't bleed over? Or if you find it's not Teague barred, it can bleed over? That's ‑‑ The right to a sufficient record? No. To be present at the ‑‑ in the Batson part of it. It bleeds over, I think, Your Honor. If there is a Teague bar that this is not a clearly established rule, then that same analysis would go to the merits discussion. And if we don't have a clearly established rule from the get‑go, then deference is owed to what the State court found and its factual findings. Okay. But if we don't find it Teague barred, what's the difference in the analysis when you're looking to the sufficiency of the record? Yes, Your Honor. You still start from the premise of what is the controlling United States Supreme Court authority. And in this case, it is Batson v. Kentucky. And then you can go to the analysis employed by the State court, including the factual findings, and the findings of not just the California Supreme Court, but, in fact, trial judge Napoleon Jones in this case, his finding of absolutely no racial motivation whatsoever for the prosecutor's reasons. And if deference is owed to those findings, then the procedural issue almost seems to disappear. Well, what about Lewis? Yes, Your Honor. I mean, it's hard for me to believe that if a defense counsel were there, just in my own experience, that you would ever be able to keep them quiet, even if they didn't have a right to speak. And if I were a defense counsel, I'd still try to say something anyway, if you thought that the court was overlooking something. How does Lewis fit in here from your perspective? I think the most important part of Lewis is that it shows the lack of clearly established authority requiring presence of counsel. Because what Lewis stated is, in that case, the prosecutor divulged the reasons in open court, but the trial court denied the motion immediately without ever permitting defense counsel the opportunity to respond to the reasons provided. And this Court said that a trial court may, but does not have to enlist the help of trial counsel at step three of a Batson hearing, and that a rule requiring defense counsel to argue is not clearly established law. A rule, but that's the – I don't think that helps you as much as you think it does, because what it said was a rule requiring defense counsel to argue. Well, that's not what we have here. I agree. Here we have over-objection counsel saying, I have the right to hear these reasons and to attack them. And that is at step two of Batson. So I don't see Lewis as being relevant at all. A case I think is more significant, and I think you would have to distinguish, is United States v. Thompson, where Chief Judge Kaczynski goes on and on and on about how this core adversarial function rooted in the Constitution, and the truth-seeking mechanism, and how fundamental it is to our system of justice. I mean, that's pretty strong language. And he leaves open there might be compelling interests, right? But that's my problem here. I mean, if you – the prosecutor said, oh, I have trial strategy, but then you look at his reasons, and there's no trial strategy. So it doesn't fit within the compelling statement, the compelling interest statement in Thompson. And the California Supreme Court quotes at length from Thompson. Absolutely. And then it says, but – so then we'll go on to the question of prejudice, which was why it denied relief. And I think in answering both Your Honor's questions, the place that we have to start from is going all the way back to Batson v. Kentucky. In that case, the United States Supreme Court specifically declined to delineate any particular procedures that lower courts must follow. Right, but it didn't say, okay, and once you establish the procedure, it's, you know, of course we're going to go allow you to do contrary to our whole American system of justice to exclude defense counsel from participating in that procedure. And so there's a variety of procedures. Ultimately, I think we've all pretty much come to the same sorts of procedures. And I've never heard of counsel being excluded from that process. Even following Batson v. Kentucky, Your Honor, in Georgia v. McCollum, the United States Supreme Court acknowledged that there very well might be a circumstance in which counsel can be excluded. Well, there is. Everybody agrees to that. All the cases say that if there's a reason like strategy, they can be excluded. Correct, Your Honor. But not without a reason. But circuits have also found that even where counsel is excluded without a compelling reason, that it doesn't run afoul of the Constitution, that we can still look to the record that remains. I mean, two circuits found that. The Sixth Circuit and the Seventh Circuit found it. Right. And after that, every other circuit agreed with the Ninth Circuit. So it's not unanimous in the circuits. But as California's Supreme Court said, it seems to be almost universally recognized. The states all did it. The majority of the circuits did it. Nobody agreed with the Sixth and Seventh Circuits in the 13 years preceding. But the Second Circuit, Your Honor, indicated tolerance to the idea. The Fourth Circuit applied a harmless error analysis following finding error from  Well, that's what I want to focus on. Because, I mean, you have the Supreme Court saying there's error. And then it says that it's harmless. And the real issue is how can it say it on this record? And given that, how much deference do we really owe it? Yes, Your Honor. This, just to briefly address counsel's argument, this would not be a structural error situation. The record that was created in the trial court in this case is one of the Well, I think there's a difference. I think you don't have to waste much time on telling us that it's not structural just to avoid a question. And I don't think you disagree that if you did exclude somewhat unracial reasons, it is, in fact, structural. That's correct, Your Honor. Okay. So I don't think there's any real disagreement on that. I think Judge Wardlow's question is the real question in the case. Yes, Your Honor. The record that was created in the trial court in this case is a thorough record of factual findings, that the trial court found support for the prosecutor's reasons in the trial record. The California Supreme Court then verified those reasons in the trial court record. Those factual findings are presumed correct unless appellant can present clear and convincing evidence to the contrary, which has not happened. Well, I have a question. Did Ayala, before the California Supreme Court, raise any specific objections to the prosecutor's stated reasons for challenges to the seven jurors? Absolutely not, Your Honor. There was never an appellate challenge to the Batson ruling itself. The challenge was to the procedure that the trial court employed, and the challenge was to the record that was left in order to pursue his appellate rights. So, no, there was never such a challenge. Well, let's just say if, since Ayala didn't put those in the record, are we in a position to think of maybe better reasons than we think Ayala's counsel came up with or didn't come up with? No, Your Honor. So when we're evaluating the deference, what are we looking at from your perspective? This Court would look to the factual findings that the trial judge made. The Court can start by looking at the reasons proffered by the prosecutor, of course. That's where we have to begin. And then look to the findings of the trial court. And as the district court did in this case, then look to the findings of the California Supreme Court. And if the trial court or the Supreme Court's findings are contradicted by the parts of the record that we have, what do we do with that? This Court would have to find that there is clear and convincing evidence to overcome what the California Supreme Court said. And most importantly, this Court would have to find that what the California Supreme Court ultimately did wasn't just wrong, not just that this Court disagrees with it, but that it was completely unreasonable. And these are the reasons. You're not applying the Brecht test, are you? No, Your Honor. Although that's what you're supposed to do for harmless error. I would contend that this Court would look to, because the California Supreme Court applied the Chapman standard, there would be epideference to the Chapman standard, and then it would go to the Brecht analysis following that. In any event. Okay. Are you familiar with Merrill-Leo v. Yates? Yes, Your Honor. And that doesn't say that the Brecht standard applies? This Court ultimately decided that, yes. Well, isn't that the law now? Yes, Your Honor. Well, aren't we supposed to apply it if it's the law now? Yes, Your Honor. Obviously, my office contended I had a different position in that case as well. And I believe that Inthevong, this Court's decision did not overrule explicitly Inthevong, and that decision is still alive and well, which applies the two-level deference to the State court's Chapman decision followed by the Brecht analysis. Do you disagree in any part of the analysis of the district court? As far as the factual findings, Your Honor? Well, the district court analysis in terms of denying the habeas. Is there any points that you disagree or that you think you have a stronger argument than the district court made? Your Honor, I think the district court got it correct in this case. So, in fact, it was an all-white jury that was seated? I believe that what the record reveals is that there were no Hispanic or African-American members on the jury beyond the makeup of that. I don't know. And we know that because we have their questionnaires, and so they identified what they were on their questionnaires. True. And the trial court also stated on the record that by the time of the third Batson challenge, the prosecutor had effectively removed the Hispanic and African-American members of the panel. The record in this case is entitled to deference, the factual findings. Can I ask one more question? Yes. And you believe it's – you agree that we don't look at anything having to do with evidence of guilt. No, Your Honor. We don't go any further than that. Right. No. I believe that he's entitled to a fair jury, and I believe the inquiry would stop there as far as harmless error analysis. Your Honor had mentioned the Thompson decision. I did want to discuss that, as well as the Alcantar decision, because those were the two cases in which this Court found that ex parte Batson procedures left a record so incomplete that harmless error analysis could not be performed. Those cases, first of all, both of which were direct appeals from Federal convictions, so a slightly different analysis, and they were pre-AEDPA decisions as well. But part of the problem, and a significant part of the problem in those cases, was the type of reasoning offered by the prosecutor. In Thompson, you have the prosecutor stating as to one juror, he lived in the defendant's neighborhood, he's black, too, he's dressed casually, the record disclosed that he was wearing jeans, and I thought he might identify with the defendant too much. Well, that seems to be the very sort of reason that a trial court should be alerted In Alcantar, the prosecutor was primarily excusing jurors because they had they were speaking with Spanish accents or because they noted in voir dire that they were fluent Spanish speakers. And there may very well have been a legitimate purpose for the prosecutor to have excluded those jurors based on the evidence that he expected was going to unfold in the case.  But here, at least the prosecutor's reason was intertwined with race. From the cold records in those cases, it's very difficult for any reviewing court to be able to confirm a prosecutor's auditory or visual perceptions as the reasons for challenging certain jurors. But here, based on the record before the State court, every reason the prosecutor uttered was as a reason for excusing a particular prospective juror is verifiable in the record. But what about this one? He appeared not to fit in with that Hispanic. He appeared not to fit in with anyone else. The standoff is with dress and mannerisms not in keeping with the other jurors and did not appear to be socializing or mixing with the other jurors. What does it mean that his dress and mannerisms are not in keeping with the other jurors? May I ask which juror Your Honor is referring to? Gerardo Ortiz. That juror, those were part, that was part of the reasoning offered by the prosecutors to that juror. I would agree that's difficult to confirm in a cold record. However, the prosecutor's primary reason for excluding Gerardo O was that he admitted in open court that he could not read or write. That is verifiable in the record and certainly a permissible basis to excuse a juror peremptorily, if not even for cause. Wait. It wasn't, they said he was illiterate, but he wasn't necessarily illiterate. It was just that he wasn't fluent in English. He stated that he had difficulty being able to read and write and had to have somebody help him fill out the questionnaire. He was having difficulty following the questioning in the, in the voir dire proceeding and the trial court did confirm that fact as well on the record. Well, he spoke, his first language was Spanish. True. That's not unusual in this country these days. Absolutely not, Your Honor, but certainly a prosecutor may not want a juror on the record to be able to read and write. That would certainly be a permissible basis for excluding a juror. The other challenges that the prosecutor offered in this case were, had to do with the fact that a prospective juror had a criminal history and that that juror in open court didn't even disclose the entirety of his criminal history. Well, there are certainly some of the challenges were valid. There's no question. Right. There's some like, well, we could discuss for a while the difference between their views of the people who were allowed to sit on the jury who were white. Right. But that would probably take too much of your time. But there's one, for instance, here, if I can find it, where they said his answers on the questionnaires were poor. Yes, Your Honor. Now, what are we supposed to do about that? What happened with that, Your Honor, and what was happening. Is that Dallas? That was. Yes. I think it's Dallas. Yes. Yes. Oh, Landers, yes. What, what, the record that is left in this case, and I am going to answer Your Honor's question. As Judge Callahan pointed out, at the time of Wadir in this case, everybody had the benefit of the questionnaires, including defense counsel. And many of the questions at Wadir were asking jurors to clarify, to amplify, to explain their answers on those questionnaires, and specifically referred to them, reading off of them at times. So even with regard to O. Landers D., Dallas, the prosecutor questioned him about the lack of explanation on his questionnaire. And that prospective juror even stated in open court that he answered the questions on there kind of fast. So this court can look to the remaining Wadir record to determine whether what the state court did was objectively unreasonable in this case. Well, now, if let's say if the Supreme Court, is this, I'm trying to decide if, if we're talking about deference, that's always, you know, I guess we're not always of one mind on that issue. Is this the type of situation that if the Supreme Court had said that this record was not adequate, that you'd be stuck with that? Just like you're arguing that they're stuck with it here, that it's entitled to deference? I'm not certain I am. Well, you know, it's sort of like abuse of discretion. Sometimes with abuse of discretion, a judge could go both ways, and it wouldn't necessarily be an abuse of discretion. It might not be the way I would do it, but I would have to affirm either way, because whether it was the prosecutor saying it was an abuse of discretion, or it was the defense saying it was not abuse of discretion. Because it's within, it's coloring within the lines, all right? It's not the way I would do it. So always looking at abuse of discretion, or looking at deference, it's most, you know, when you lose, you would always rather have de novo review. Right. Because then that allows the court to sort of make a fresh look. But if you don't have de novo review and it's deference, is this the type of record that whatever the court had done, it wouldn't be unreasonable? Based on what the trial court did, yes. Well, I mean, if the Supreme Court had said that the defendant was entitled to relief, would you be stuck with that? If the Supreme Court, would we have to give that deference, the same deference that you're asking to? No, Your Honor, because I think that would be an unreasonable reading of the record. It would still, you would still have to find... Is it possible, though, that there could be two readings of it and neither would be unreasonable? I don't believe so, Your Honor. I believe the record was so thorough in this case, even without the participation of defense counsel, there was nothing more that defense counsel could have said or done to have changed the trial court's mind. And what the trial court did was... The answer that some people gave were the answers that people who were permitted to sit were the answers given by the minority members who were not permitted to sit. The – first of all, Your Honor, there was never a suggestion that the California Supreme Court should have done a comparative analysis in this case. That there – the... Isn't that compelled by Miller L.? Only if there is an actual appellate issue. Can't be Canberra? Only if there's an actual issue, and the actual issue isn't that you've disqualified all the minority members and you've let... No, Your Honor, that is not the issue. That's not an issue? That is not an issue in this case. It was never raised before the State court as the trial court got it wrong as to the Batson ruling. It was that the record was too incomplete to raise the issue. But if this Court reads Appellant's own brief in this case, absolutely, any court could have conducted a comparative analysis. What you have remaining of the record is the entire voir dire transcript, which contains many questions about the jurors' questionnaire responses themselves. The only questionnaire – the last questionnaire at issue here, the only ones that are important, are the seven of the challenged – Batson-challenged jurors. The – all the other questionnaires have no bearing on this Court's decision whatsoever because they were not seated and not challenged. This Court still – any court, any reviewing court has still had the entire voir dire transcript, has had all of the questionnaires of the seated jurors. So to the extent that Appellant claims that the prosecutor's proffer of reasons in chambers had to do with a response on those jurors' questionnaires, well, any court could have compared those responses and that proffer to the questionnaires of the seated jurors. We still have those. And finally, Appellant has known that the prosecutor's stated reasons for excluding the seven prospective jurors from the direct appeal forward in this case. So where a portion of the record is missing, it is incumbent on Appellant to show prejudice in some way from that – from that decision. But all that Appellant has needed to challenge the trial court's decision on the Batson issue, he has always had in his possession. That's not the issue here. The issue is whether the California Supreme Court was objectively unreasonable in rejecting his claim that the procedures and that the loss of the questionnaires – You keep going to objectively unreasonable. I asked you about Merrill E. O. v. Yates, and that's not the test there. It's the Brecht test. Correct, Your Honor. All right. And frankly, under either. Under whether it's Edpa deference to Chapman or whether it's Brecht. It doesn't matter.  So it's a Brecht test. And Are you conceding it's the Brecht test? I would still stand by this Court's decision in Inthevong, because I don't believe that was specifically overruled. But I understand the Court's position. But I don't think it matters in this case in any event. It cannot be said in this case that the California Supreme Court's denial of relief was objectively unreasonable beyond any possibility for fair-minded disagreement. That's not the test in Brecht, is it? That's the Edpa deference standard, Your Honor. Okay. Well, now you've confused me. You've said both that we apply the Brecht and that we apply Edpa, which is it? Well, I would go back to my initial point when I started my argument that the – what we're looking at here is the California Supreme Court's denial of relief as to this claim, which would be entitled to Edpa deference. You mean the end result? The result. Brecht. That's what this Court has recently decided, yes. Okay. Well, it decided that because the Supreme Court in two cases decided that. Yes, I understand, Your Honor. So you're saying even if you apply Brecht, you're saying it's harmless beyond a reasonable doubt? Correct, Your Honor. Absolutely. Based on the record that remains in this case, as I have stated, there was enough for the California Supreme Court to reach its conclusion, there was enough for any reviewing court to reach its conclusion, and whether that is something about which reasonable minds could disagree, then the State court's decision should prevail in this case. Unless the Court has further questions. Thank you, Judge. Thank you. Your Honors, I want to go back to two points. Well, a point and a question Judge Wardlaw raised. First of all, In re Winship, which states that there must be a written record adequate to permit effective review, was 1970. Griffin v. Illinois, which discussed the requirement of a record adequate and effective for appellate review, was 1956. So both of those are prior to Teague. And I bring up something that Your Honor said about Batson, which is it's actually the State that's trying to create a new rule. It's saying that under Batson, there's some new rule now that you can exclude a defendant from a critical stage. Batson never said that chronic didn't apply. Batson never said that the series of historical cases didn't apply. Moreover, what we pointed out to the Court is that Miller L., which this Court has held was not a new rule, but really said what Batson said is you need a record sufficient to do a comparative analysis, and every court along the line must be able to do that. Well, would you concede that your record, though, I mean, of what was there, there is no, there isn't, it's not, it's a weaker record than Miller L. It's a weaker record, and it's, you can't do the comparative analysis. Judge Reinhart actually said it with Dallas, and I don't want to say the full name, but that the prosecutor actually stated as a reason, and I don't know how the State says some were better than others or given more significance. One of his reasons was poor responses on the questionnaire, and the questionnaire is lost. So defendant. I thought I heard the government counsel say that we have the questionnaires for the excused jurors. No, no, no, only the seated jurors, and she actually said that, only the seated jurors. So we don't have the. We lost all the questionnaires for the seven excluded jurors. The peremptory ones. That's correct. And so, yes, thank you, Your Honor. So we're whipsawed. We weren't allowed when the defendant had the questionnaires, and his counsel had them, to hear the reasons to do either a comparative analysis, which is mandatory under Supreme Court law, dating back to Batson according to this Court's analysis and know-it-all, nor to do an analysis directly related to the questionnaire and the prosecutor's stated reasons. Were they poor, and what does that mean? So this isn't a game of horseshoes. An effective record under Batson is one where all the relevant evidence is considered, not some, not most. So in answer, Judge Callahan, to your question, you cannot give deference to the California Supreme Court's statement just as Justice George said you can't because it's an illusory record. Well, but unfortunately, Justice George is in the dissent. So if we go to the majority. No, but you're asking the question of deference, and you asked for something specific. Why can't we give deference? Because it's illusory. Because you've lost both any input counsel could have given and anything on the questionnaires that could have responded to what the prosecutor said. And the prosecutor pointed to the questionnaires. I'm actually. Well, I feel like you're conflating that argument, that because of your, because of the procedural issues that you see, you're saying that, therefore, it equates to no deference. But if I get to the point of deference, then I've got to decide. Then I have to look at objectively reasonable or unreasonable. And objectively means. But I feel like you're just saying, well, you never get to that. But I'm telling you, if I get there, then I need to. And that's my point. If you get there, you find that because Batson requires all the relevant evidence to be considered, Miller L. says you have to do a comparative analysis. How can you do a comparative analysis? And I'll give you two examples. When the prosecutor says, poor responses on the questionnaire. Without looking at the responses on that questionnaire, comparing them to the jurors who sat to see whether there were likewise, quote, unquote, poor responses. Without taking the questionnaire and having a defense counsel challenge the prosecutor's reasons. Say, these aren't poor. What do you mean by poor? You can't do it, so the record is incomplete. And what do you do when the prosecutor says, well, this person was rejected for as a police officer. That came from the questionnaire. And yet someone who sat, whose questionnaire we had, had a similar response, which indicates pretextual nature. How can you do that comparative analysis when there's no questionnaire? That's why I'm saying, even if you said I'll give deference, you can't in that case because the record is incomplete. And, again, I know he was in the dissent, but Justice George was on point. Irremediably incomplete. We can't come, as Boyd could, this Court in Boyd said, send it back, get the record. That was one where the appellate court said we're not going to allow the four-year record. I'm curious, though, what specific reasons, the prosecutor said you didn't give any, but what specific objections did you raise before the California Supreme Court to the stated reasons for the challenges of the seven jurors? We went through exhaustive discussions of the record and the distinctions that could be made just as we did in this Court. What counsel is saying is because you were handcuffed and didn't have a complete record, you still had to fight the Batson fight. That's saying we, because the State caused it, we tied one hand behind your back, now let's fight Batson. And guess what? The California Supreme Court said on this record it's sufficiently complete for us to say there's no Batson error. Well, now we got smacked a third time because we're pointing out that the record's not complete, just as George pointed that out. We shouldn't be forced into saying there was or was not Batson error. What we should be saying is the record is irremediably incomplete such that you can't conduct a Batson analysis. That's the case. If we agree with you, what's the remedy? The remedy is you have to issue the writ. But you can't have an evidentiary hearing at this point, right, Judge Jones? Only on the Vienna Convention issue, which we didn't argue. But, no, you can't unless we attempted to reconstruct the record. It was a good-faith attempt on everybody's part. But this is a point that Justice George also made. You had all these questionnaires, and for someone to remember everything on the I think we answered Judge Wardle's question, and I would appreciate it if you would tell me that I'm wrong. The point is that the remedy at this time is you have to reverse the conviction and the sentence. You do. I'm sorry, Your Honor. I should have been more direct. Yes, you do. If this had been maybe a year after, you could have attempted to do something about the record. That's correct. But I think the cases say that when it's more than a certain amount of time, at least two or three years. No, I mean, are you saying only the conviction or are you saying only the sentence or the conviction and the sentence? You're saying the conviction and the sentence. I believe you have to. Well, yeah, that's what I think. I wasn't hearing what you said. There's only one way to distinguish them, and I think you mentioned that indirectly, but I'm not sure how far you'd get with it. But the only basis you could distinguish it on is the Eighth Amendment argument. Correct. Correct. But I want to point this out. It was four years afterwards that I was appointed, and by the time you get around to record reconstruction, your five, six years, Judge Jones had actually been appointed to Federal bench at that time. There is a case, and it slips my mind whether it was a State case or a Ninth Circuit, that said after several years, it's just too late. So then would the State be able to retry Ayala, and that would be what would have to happen? Yes. I don't believe that this would prevent a retrial, but it certainly, given the state of the record, there's no choice. How long has he served now? The conviction was in 1989. And how old is he now? I gauge him by how old I am. I believe he would be 54, somewhere between 52 and 54. I forget how many years younger than that. I thought he was 62. Okay. All right. Thank you. Thank you. Thank you both very much. Thank you all three very much. Excellent argument by all. Yes. It was very helpful. Very helpful. Thank you. Court will stand and recess for the day. All rise for the Senate recess for the day.
judges: Reinhardt, Wardlaw, Callahan